DANIEL W. DIMICH AND MIKE DIMICH, JR., ADMINISTRATORS OF THE ESTATE OF MIKE DIMICH, DECEASED, PLAINTIFFS AND RESPONDENTS, v. NORTHERN PACIFIC RAILWAY COMPANY, A CORPORATION, AND PETER DULL, DEFENDANTS AND APPELLANTS.

No. 9827.
Submitted September 15, 1959. Decided December 16, 1959.
Rehearing Denied February 4, 1960.
348 Pac. (2d) 786.

See **C. J. S.** Appeal and Error, § 305.

Coleman, Lamey & Crowley, Billings, for appellants. John C. Sheehy, Billings, argued orally.

J. H. McAlear, Red Lodge, for respondents.

MR. JUSTICE BOTTOMLY delivered the Opinion of the Court.

This is an appeal by defendants from a judgment entered on a verdict in favor of plaintiff in a personal injury action and from an order denying defendants' motion for a new trial.

On the evening of November 12, 1953, at about the hour of 7:15 p.m., Mike Dimich, plaintiff herein, was riding as a passenger in an automobile traveling between the towns of Rockvale and Joliet, Montana. There were three people present in the automobile. Mike Dimich, the owner of the car, was in the front seat riding as a passenger; C. Natali was driving; and a third person, Frank V. Swenson, occupied the back seat. The automobile was proceeding on U. S. Highway 12, a well traveled, black top, oil surfaced highway. The ultimate destination of all persons in the car was Red Lodge, Montana.

Approximately one-half mile from the town of Joliet, U. S. Highway 12 crosses over a branch line of the Northern Pacific Railway, which branch line extends from Laurel, Montana, where it leaves the main line to Red Lodge, Montana, where the line terminates. After the branch line of the railway is crossed, the highway then curves and proceeds approximately parallel to the branch line of such railway and then passes through the town of Joliet. From the point where the highway turns to parallel the branch line, going through Joliet, the highway then runs in a straight line. There is, however, a grade from the intersection of the highway and the branch line up to approximately the limits of the town of Joliet. Within the town limits of Joliet a spur or switch track takes off from the branch line of the Northern Pacific Railway Company and extends across U. S. Highway 12, at a 27 degree angle, and then ex-

tends some 400 feet to a grain elevator which is located on this siding in Joliet. From the start of the straight stretch of highway after crossing the branch line of the Railway Company to a point approximately 150 feet from where the railroad spur track crosses U. S. Highway 12 within the town of Joliet the grade of the highway rises approximately 1.89 or 2 percent. From the point 150 feet from the spur crossing, the highway is level to and beyond the crossing. The spur itself, on November 12, 1953, was about four inches lower than the road surface, and is entirely unmarked. There were no warning signs proclaiming its existence in any manner or form and there were absolutely no warning devices of any type at the intersection crossing Highway 12.

At a point 125 feet from the spur crossing and between the spur crossing and the approaching Dimich car was a highway sign which read: ''Entering Joliet Speed Limit 25.'' The city limits of the town of Joliet were located approximately at the point where this sign post was placed.

It was dark at the time the Dimich car was approaching Joliet and the car headlights were on. As the Dimich car approached Joliet a train of the Northern Pacific Railway Company, one of the defendants herein, consisting of a locomotive and two tenders, was engaged in spotting a box car upon the spur track at a point between the grain elevator and the intersection of the track with U. S. Highway 12.

As the car in which the palintiff was riding approached the crest of the incline which was located some 150 feet from the point where the railroad spur crossed the highway, the locomotive was moving slowly across or already occupying a portion of the highway roadbed. At the intersection where the spur crossed the highway the Dimich car collided with the front end of the Northern Pacific locomotive. As a result of the collision, Mike Dimich suffered painful and permanently disabling injuries. This suit was commenced by Mike Dimich to recover for these injuries.

In his complaint, Mike Dimich alleged that the intersection of the railroad spur track and U. S. Highway 12 in regard to persons traveling U. S. Highway 12 in a direction approaching the town of Joliet from the town of Rockvale, Montana, was highly dangerous and unsafe; that the crossing was unlighted, and unmarked and without warning devices; that the spur was infrequently used, and such use of the crossing as was made by the Railway Company was unknown to the public generally and particularly unknown to the plaintiff; and that in addition to the above conditions, the intersection was particularly dangerous in that as one approached Joliet, as this plaintiff had approached the night of the accident, the lights of the town of Joliet and other lights were facing the plaintiff, the effect thereof was to obscure the intersection and to make the presence of trains thereon unnoticeable.

The plaintiff then specifically set out that the intersection was highly dangerous because it was unlighted; that the Railway Company failed to have any person give warning of the presence of the train on the crossing; failed to sound a bell or whistle to warn of the presence of a train on the crossing; and to have warning signals installed to indicate the presence of a train at the crossing. Also that no lights or flares were present as warnings; no lookout was kept for approaching automobiles; that the train was not kept under sufficient control to avoid collision with motor vehicles on the highway; and that the defendant negligently drove the locomotive into the portion of the highway being used by the automobile in which the plaintiff was riding.

At the trial, the evidence produced showed that the Dimich car was proceeding up the incline toward Joliet at a speed not in excess of 55 miles per hour, the legal maximum speed at that time of night for this highway; that at a point 1,150 feet from the intersection where the collision occurred the Dimich automobile was 18.9 feet lower than the level of the intersection; that at a point approximately 160 feet from the inter-

section the driver Natali evidently saw something and commenced to apply the brakes on the automobile; that the brakes were applied with such force that the wheels locked and the tires were dragged on the surface of the highway; that when the brakes were applied the Dimich car was in its own lane of the highway; that after the collision between the car and the locomotive, the car was pushed some 11 feet along the same direction the train was moving; that the plaintiff did not hear any bells or whistles from the train before the impact and that both he and the driver of the automobile did not see any lights on the train. The evidence produced at the trial also showed that the crossing was unmarked and was not often used except in the fall when grain was being loaded from the elevator located along the spur track; and that the plaintiff knew the track existed but had never himself seen it in use.

The employees of the railway testified that they were, just prior to the collision, in the process of dropping off a freight car; that the car was to be placed between the elevator and the point where the spur track intersected Highway 12; that when the car was being dropped off, the locomotive was headed in the direction of the branch line and extended into the intersection; and that the locomotive was stopped, the lights were on, the bell was ringing and the whistle was blowing. They testified they saw the car approach, blew a warning whistle and the car proceeded on and collided with the front end of the locomotive.

After trial to a jury, a verdict was rendered for the plaintiff. From the judgment entered on such verdict and the trial court's order denying a new trial, the defendants brought this appeal.

On appeal some twenty-six specifications of error are set out which appellants group into five issues of harmful error occurring in the trial of this action. We will review these asserted errors in the order in which they are raised by appellants.

First, appellants contend that this was an ordinary country crossing, common to the State of Montana, and was not extra hazardous. In this respect, appellants contend the District Court committed error when it gave the following instruction to the jury:

"The Court instructs the Jury that if you believe from a preponderance of the evidence that the railroad crossing, which was the scene of the collision in question, was more than ordinarily dangerous to persons traveling upon the highway over such crossing, by reason of the surrounding facts and circumstances shown to exist at the time of the collision, then it was the duty of the defendants, in running the train over said crossing, to provide such signals as were reasonably necessary to give notice to travelers on the highway of the approach or presence of the train on said crossing; and if defendants failed to provide such signals as were reasonably necessary at said crossing, under the circumstances existing at the time of the collision, and if you further find that by reason of such failure of the defendants the plaintiff received the injuries complained of, and that he did not help to cause or bring about his injuries by negligence on his part; and you further find that the sole, proximate cause of his injuries was not the negligence of the driver of the car, which plainiff owned and in which he was riding, then your verdict should be for the plaintiff and against the defendants."

It is the position of the appellants that this instruction should never have been given since the facts and circumstances to support it were not present in this case. The appellants contend that the instruction is confusing and that the actual facts and circumstances of this case are such that the court should hold this crossing is not extra hazardous as a matter of law.

The crux of appellants' position is this. As a general rule, at an ordinary country railroad crossing, it is not negligence on the part of the Railway Company in failing to blow the whistle or ring the bell, or place warning lights along the train,

or provide a flagman to warn the traffic. The reason for this rule has been explained in the case of Incret v. Chicago, M., St. P. & P. R., 107 Mont. 394, 86 Pac. (2d) 12, to be that a train standing on or passing over a railroad crossing is in itself a sufficient warning of danger to the traveling public. And see Broberg v. Northern Pacific Ry., 120 Mont. 280, 182 Pac. (2d) 851. However, as pointed out at page 289 of 120 Mont., at page 856 of 182 Pac. (2d) of the Broberg case, supra, "if the crossing is extra hazardous the general rule does not apply."

Appellants here seek to have the general rule apply and not the exceptions thereto as set out in the above instruction, which evidently was the same identical instruction at issue in the Broberg case and is in issue here again.

In our review of this case, we must first ascertain whether this crossing should have been determined to be an ordinary crossing as a matter of law. In the Incret case, supra, based upon the facts of that case, this court held the crossing there in issue was not extra hazardous as a matter of law. In that case, an automobile hit a train which was moving over an ordinary railroad crossing. The train was actually occupying the entire crossing when hit. The engine was well past the crossing, and *the crossing was well marked. As the train approached a flagman had signaled its approach.* After the engine passed over and through the crossing, the flagman had then ceased his warning signals. The automobile collided with the train after the flagman had left the middle of the crossing. *There was an arc light in close proximity to the crossing, and warning signs were placed along side of the highway.* The approach to the railroad crossing was level.

In the Incret case, crossing gates across the intersection were available but had not been used on the night that the automobile hit the moving train. In reviewing that case, this court held, that because of the other facts and particularly because the train itself was on the crossing, that its presence on the crossing constituted sufficient warning in itself and that suffi-

cient facts were not shown to constitute this crossing extra hazardous even with the train there. However, the facts in the Incret case are not similar to the facts which have been presented here. In this case, the train was occupying only a portion of the highway or was just commencing to cross over into the portion of the highway where the driver, of the automobile involved here, was required to drive.

The car in this instance did not hit a train occupying the entire crossing. The train was slowly moving across the crossing and this crossing, unlike the Incret crossing, was not marked in any manner with any signs or warning devices. This crossing actually was invisible to traffic approaching as the Dimich car approached. At 1,150 feet from the crossing the automobile occupied by the plaintiff was 18.9 feet lower than the crossing. In addition, after traversing 1,000 feet and ascending this 18.9 feet the crossing was then located an additional 150 feet back of the crest of the incline. Until the windshield of the car reached the level of the crest of the incline the tracks were invisible and even when that point was reached the tracks being countersunk on the highway were actually not within sight until a closer point was attained. Obviously, in the light of these facts, this court cannot hold that this crossing should be declared to be an ordinary crossing as a matter of law.

As a general rule in Montana, the question of whether or not a crossing is an ordinary crossing or an extra hazardous crossing is a question of fact for the jury to decide. See Broberg v. Northern Pacific Ry., supra, and cases therein cited. As said in 44 Am. Jur., Railroads, section 506, page 747, "Whether or not a given crossing is unusually dangerous is a question for a jury, unless only one conclusion could be drawn by all reasonable men from the evidence relative thereto." And as stated in 3 Blashfield's Cyclopedia of Automobile Law and Practice, page 203:

"Whether or not the surroundings and conditions at any particular crossing, disclose such a state of facts as to mark

such crossing as one attended with unusual danger or extraordinary hazard, so as to require resort to gongs, flagmen, gates, signs or other like precautions at the crossing is a question of fact for the determination of the jury unless only one conclusion can be drawn therefrom by all reasonable minds.''

Such was not the case here, and this question then was clearly a matter to be submitted to the jury.

The instruction given to guide the jury in the event that they found from the facts and circumstances that this crossing was extra hazardous was proper. This same instruction, with a small addition, was upheld as a proper instruction of law by this court in the Broberg case, supra. The only difference between the instruction given in this case and the instruction given in the Broberg case was this: In the Broberg case the instruction was in part that it was the duty of the defendants in running the train over said crossing in addition to the use of ordinary signals to provide such signals as were reasonably necessary to give notice to travelers on the highway of the approach and presence of the train on said crossing.

In this case, the instruction used deleted the words ''in addition to the use of ordinary signals,'' this deletion did not change the legal effect of the instruction. This instruction was held proper in the Broberg case, and there is nothing unusual or extraordinary about this case so as to make the use of the Broberg instruction in this case error. In fact the instruction, with the deletion, is actually more favorable to the appellants and imposed a greater burden upon the plaintiff to show negligence.

The appellants contend, that in any event, the crossing was not extra hazardous and that the evidence would not support a jury finding that such was the case. As we have pointed out, the cases hold that the determination must be made upon the individual factual situations. In the Broberg case, this court set out the various factors there involved which would be considered to determine whether or not a crossing was extra

hazardous. Many of the factors present in the Broberg case are also present here. There, as here, the approach to the crossing was up-grade. The accident occurred at night when visibility was limited. The road in both cases was black topped and both automobiles hit black colored objects. In the Broberg case, warning signs existed but were obscured. Here, no warning signs were present at all. There, as here, the crossing was seldom used and although appellants assert the infrequency of use is the sole basis for the plaintiff's contention of an extra hazardous crossing, such is not the case. The plaintiffs actually asserted and showed the following conditions existed: The night was dark; there were no signs indicating the presence of the railroad engine; the highway was a black topped highway; there were no "railroad crossing signs" at the side of the highway; there were no lights illuminating the railroad track; no signals by any brakeman stationed on the crossing while switching, or other employees of the railroad, were given to warn oncoming traffic of the presence of the locomotive upon the crossing; and the crossing was seldom used at any time, especially not in the nighttime.

Upon the factual situation existing in this case, the question of whether or not the crossing was extra hazardous was properly submitted to the jury. The instruction, so submitting the question to the jury, properly stated the applicable law.

The instruction given did not command that the jury find the crossing extra hazardous, it merely pointed out the rights and liabilities of the parties in the event the jury found from the evidence that the crossing was extra hazardous.

The physical conditions of the intersection and all the surroundings were in evidence for the jury's consideration. The evidence concerning warnings given or not given by the defendants was conflicting but as said in Wilson v. Wininger, 136 Mont. 120, 345 Pac. (2d) 374, 376:

"The jury heard the witnesses and found for plaintiff. There is considerable conflict in the testimony, but there is substan-

tial evidence which, if believed, sustains the verdict of the jury. We have often stated that a verdict based on substantial but conflicting evidence will not be disturbed on appeal.

" 'In Carey v. Guest, 78 Mont. 415, 424, 258 Pac. 236, 238, this court said: ''The judgment is based on the verdict of the jury. A judgment will not be disturbed when there is substantial evidence to support it. Tuttle v. Pacific Mutual Life Ins. Co., 58 Mont. 121, 190 Pac. 993, 16 A. L. R. 601. When there is a substantial conflict in the evidence the Supreme Court, on appeal, will not reverse the judgment on the ground of insufficiency of the evidence. Sanborn Co. v. Powers, 58 Mont. 214, 190 Pac. 990.'' See also, Robinson v. F. W. Woolworth Co., 80 Mont. 431, 447, 261 Pac. 253; Chancellor v. Hines Motor Supply Co., 104 Mont. 603, 612, 69 Pac. (2d) 764; Reynolds v. Trbovich, Inc., 123 Mont. 224, 226, 210 Pac. (2d) 634.' Holden v. Varner, 128 Mont. 211, 272 Pac. (2d) 1008.''

The second contention of appellants is that the jury was improperly and insufficiently instructed on the legal rights and obligations of motorists approaching railroad crossings on the one hand, and of the railroad using its right-of-way across highways on the other hand. In support of this contention, appellants set out various instructions which allege it was error upon the part of the court to refuse to give and assert certain given instructions were erroneously given.

We have examined and considered, as one entire instruction, all of the instructions given bearing in mind that this court has heretofore said that all the instructions given must be considered together. See Koppang v. Sevier, 106 Mont. 79, 75 Pac. (2d) 790; Reynolds v. Trbovich, Inc., supra, 123 Mont. 224, 210 Pac. (2d) 634; and Hightower v. Alley, 132 Mont. 349, 318 Pac. (2d) 243.

The appellants contend that these instructions are inadequate to apprise the jury of the rights and duties of the plaintiff and the rights and duties of the defendants in this action. It is their contention such instructions do not cover their theory

of this case, that is, that this was an ordinary country railroad crossing.

In specification of error No. 3, it is asserted that the court erred in refusing to give an instruction concerning the fact that the presence of a railroad track is in itself a warning of danger to the traveling public. This instruction was properly refused. It presumed facts which were not in evidence in this case. This side track was, to these travelers, practically invisible. There were no warning signs that the track existed at that particular point and to charge these people with the duty of being warned by something which they could not see and were not warned of would have been error had the instruction been given. For the same reasons as given above, the District Court was not in error in refusing to give the instructions set out in specifications of error Nos. 5, 6, 7, 8, 11 and 18.

Specifications of error Nos. 4, 9, 15 and 16, also concern instructions which the trial court properly refused to give. The instructions, if given, would have been repetitious and confusing to the jury. Other instructions given by the court concerned and covered the applicable law stated a little differently in the refused instructions.

We have examined each and all of the specifications of error upon which the respondent contends that error was committed in either refusing to give or giving certain instructions. Applied to the facts in this case, the instructions given were proper and all of the instructions which the court refused to give would have been erroneous because they were either repetitious or concerned facts which were not in evidence in this case, or did not apply.

The third general specification of error is that the instructions on contributory negligence were hopelessly confusing. We have examined these instructions and find that the instructions in every instance define contributory negligence and make it clear to the jury that if the driver or the plaintiff in this action was negligent and that if such negligence was the proxi-

mate cause of the accident then, and in that event, it would be a bar to recovery by the plaintiff. The law of this case correct or not was that the driver's negligence, if any, was imputable to the plaintiff. These instructions correctly state the law on contributory negligence applicable to this case. See Hightower v. Alley, supra, 132 Mont. 349, 318 Pac. (2d) 243.

The fourth general specification of error is that the District Court erred in not admitting in evidence Ordinance No. 130 of the Town of Joliet relating to speed limits. The contention of appellants is based upon this proposition. Some 125 feet from the intersection where the collision occurred was a sign proclaming "Entering Joliet," and announcing "Speed Limit 25." The town limits of Joliet were located at approximately the place where this sign was placed. The Dimich automobile had to pass these signs before it reached the intersection where the spur track crossed the highway. After establishing the town limits as being at the point where the speed sign was located, appellants then attempted to introduce an Ordinance of the town of Joliet which ordinance would have validated the speed limit of 25 miles per hour so proclaimed and announced by the sign. The appellants' contention then would have been that the evidence would show that at the identical place where the sign was passed, the Dimich car was exceeding the speed limits, and that such a violation of the law would constitute negligence *per se* on the part of the plaintiff and/or the driver. While the proposition that you can be legally obeying a state speed limit of 55 miles per hour at one point and then at a point two feet distant become negligent because of a change in a town's speed limit is exceedingly far fetched, nevertheless conceding this point for the sake of argument in this matter, was the evidence sufficient to show the existence of a valid ordinance?

While doubt exists in our minds that negligence *per se* could be predicated on the speed of plaintiff's car, in any event under the factual situation of this case, is appellants' contention the

ordinance should have been admitted well taken? We believe not. The ordinance to be introduced must be specifically pleaded, and then proved, and courts cannot take judicial notice of such city ordinances. Carey v. Guest, 78 Mont. 415, 258 Pac. 236.

It then became the appellants' duty to prove this ordinance existed. The appellants offered as evidence of the existence of the ordinance, the minutes of the town council containing the ordinance. When these minutes were offered to prove the ordinance, the plaintiff objected. The objection was that the minutes did not show the ordinance was properly enacted and recorded, and the plaintiff contended that the evidence offered did not show that the ordinances were put in an ordinance book as required by statute. Further, the minutes did not set out the number of votes cast for or aganist the ordinance as required by law.

The appellants assert that the evidence offered was sufficient, relying upon the case of O'Brien v. Drinkenberg, 41 Mont. 538, at page 546, 111 Pac. 137, at page 140, where it is said: "The law never contemplated that the proceedings of a town or village council should be kept with all the formality and legal nicety * * * of a court of record."

While this may be the case in the circumstances as presented in the cited case, the laws are still enacted to be observed. In the case relied upon by the respondents, the quoted language used, in holding that the minutes of a town council reciting the fact that the proper procedure had been followed to call a special meeting of a town council, were sufficient, without more, to support the formal proclamation of the mayor which was a necessary prerequisite of the special meeting itself.

In the O'Brien case, the party alleging that such special meeting was illegal never produced proof to offset the minutes and they were held sufficient to establish the legality of the meeting without anything more. Here, however, the burden was upon respondents to establish the legality of the ordinance,

which should be in an ordinance book, and whose passage should be recorded, which record should show the number of ayes and noes for or against the passage of said ordinance as required by statute. However, all that is offered is a minute book wherein it is stated the ordinance was passed without anything more.

While informality may be allowed in certain instances and official duty generally may be presumed regularly performed, the law mandatorily sets out the method of enacting a legal ordinance and commands the procedure which must be followed in respect to recording the votes for or against the passage of the ordinance and making a record of the enacted ordinance. This law is for the protection of the general public.

The respondent's objection was based upon these facts: The minutes, being offered, proved that the ordinance here at issue was an emergency ordinance which by the provisions of R. C. M. 1947, section 11-1106, would be effective immediately upon passage and require a two-thirds vote for passage; that R.C.M. 1947, section 11-1014 is mandatory in that ''The ayes and noes *must* be called and recorded on the final passage of any ordinance.'' Emphasis supplied.

Further, R. C. M. 1947, section 11-1102, requires for authenticity that the ordinances shall be kept in an ''Ordinance Book.''

What was here sought to be introduced was not an ''Ordinance Book'' but a ''minute book,'' and such minute book did not show that the ordinance was passed by more than two-thirds vote of all the members elected, nor the ayes and noes voted thereon.

The minute book, being insufficient to show that the ordinance was legally enacted pursuant to law, was not sufficient evidence of a valid ordinance regulating the speed limit in the town of Joliet, Montana. Without more, as far as this case was concerned, such an ordinance never existed, and therefore the State regulation applied.

The fifth general specification of error was that the issue

of damages for loss of respondent's earning power was based upon improper evidence and the instructions thereon led to speculation and conjecture.

The specific objection of appellants is that it was brought out that the plaintiff at the time of the accident was the owner and manager of a business and that immediately prior to the accident the plaintiff was in the process of expanding his business by opening a new plant in Billings, Montana; that after the accident the new plant was opened; and that plaintiff continued as the manager of the Red Lodge plant but was never able to manage the Billings plant as he had contemplated because of his injuries.

Evidence was introduced as to what it would cost to hire a manager of the Billings plant. The evidence as to cost was based upon potential sales. The evidence was proper. It was based upon what a manager would or should *produce* in sales. It is asserted that since the manager would not himself make these sales this evidence relates to the earnings of others and is not confined to the earning power of the plaintiff himself. The contention is not well-taken. Any manager or owner might depend upon the efforts of others for what he ultimately makes himself, yet if he is unable to perform the labors and exert the direction which will produce benefits from the labor of others and must, because of the negligence of another, be forced to hire and pay another person to perform his work, then he is certainly damaged.

We have examined the instructions offered in respect to damages which the plaintiff could recover in this action and find them to be proper. They do not lead to conjecture or speculation. They were limited by the prayer of the complaint and the evidence offered as to loss of earning power. If the jury found any loss of earning power resulted from the plaintiff's injuries, they were given a definite formula to follow to determine what should be the monetary damages payable to

plaintiff to compensate him for such loss as they found. The district judge was correct therein.

We have examined carefully the many specifications of error urged by the appellants. To set each one out and comment thereon would needlessly lengthen this opinion. We find no reversible error herein and accordingly the judgment and order from which this appeal was taken are affirmed.

MR. JUSTICE ADAIR concurs.

MR. JUSTICE ANGSTMAN:

I concur in the result reached but not in all that is said in the foregoing opinion.

MR. CHIEF JUSTICE HARRISON dissenting:

I am unable to concur in this opinion and therefore dissent. While I do not wish to enter into an extended discussion of my views in all particulars, I do not believe the crossing involved in this case was extra hazardous.

Insofar as the majority opinion holds that the instructions clearly state the law on contributory negligence I most emphatically disagree.

Mr. Justice Bottomly has quoted Instruction No. 22, and I wish to refer to that portion of it dealing with the doctrine of contributory neglgience, wherein the court instructed the jury: "* * * and if you further find that by reason of such failure of the defendants the plaintiff received the injuries complained of, and that he did not help to cause or bring about his injuries by negligence on his part; and you further find that the *sole, proximate* cause of his injuries was not the negligence of the driver of the car, which plaintiff owned and in which he was riding, then your verdict should be for the plaintiff and against the defendants." Emphasis added. It will be noted that the court definitely told the jury that if they found that the *sole, proximate* cause of the injuries to the plaintiff was not the negligence of the driver of the car

their verdict should be for the plaintiff and against the defendants.

In Instruction No. 26, the court states:

"You are instructed that on the issue of contributory negligence on the part of the plaintiff, owner of the automobile, and C. Natali, the driver thereof, the burden is upon the defendants to prove such contributory negligence by a preponderance of the evidence.

"If you should find that the plaintiff or Natali were in any manner negligent, such negligence would not bar plaintiff's recovery herein unless you further find from the preponderance of the evidence that such negligence, if any, was a *sole, proximate* cause of the injuries, if any, which plaintiff sustained." Emphasis added.

Here, the court is instructing the jury that the negligence of the driver of the plaintiff's car would not bar a recovery by the plaintiff unless such negligence was a *sole, proximate* cause of the injuries sustained by the plaintiff.

In Hightower v. Alley, 132 Mont. 349, 356, 318 Pac. (2d) 243, 248, the jury was instructed that if plaintiff's negligence was a proximate cause of his injury and death such contributory negligence would be a complete defense to the action. The court there further instructed the jury that any negligent act or omission of the deceased which may have contributed *remotely* to his injury would not be such defense, if it was not an immediate and proximate cause of his injury and death. In holding that there was no conflict between these two instructions this court stated: "When considered together the two instructions make it clear that before contributory negligence of decedent would bar recovery it must contribute not *remotely* to his injury and death but immediately and as a proximate cause thereof."

In the later case of Wolf v. Barry O'Leary, Inc., 132 Mont. 468, 318 Pac. (2d) 582, where an instruction was given which defined contributory negligence as such negligence as *helped*

to produce the damages complained of and that if the plaintiff was guilty of any act of negligence that proximately caused or *contributed* to the damages complained of, then the plaintiff could not recover, this court held such instruction erroneous. We there stated on pages 473 and 474 of 132 Mont., at page 585 of 318 Pac. (2d):

"Looking now to the instruction upon which the plaintiff predicates error, we find that the District Court in defining the causal relationship between the acts of plaintiff and the injury alleged utilized the words 'helping' and 'contributing.' This was misleading and incorrect. In Pilgeram v. Haas, 118 Mont. 431, 167 Pac. (2d) 339, 349, this court said: 'In an action involving contributory negligence the court should soundly define it.'

"By utilizing the words 'helping' and 'contributing' the trial court misled the jury into believing that these were criteria upon which they could predicate contributory negligence. This was manifestly incorrect as illustrated by the aforementioned authorities. 'Helping' and 'contributing' have never been the standard set down by this court upon which to base a causal relationship. We have always adhered to the strict formula of 'proximate cause.' No less formula will suffice to give the jury a correct instruction on contributory negligence. The plaintiff's fault does not affect her right of action, unless it *proximately* caused her injury. It must be a proximate cause, in the same sense in which the defendant's negligence must have been a proximate cause in order to give any right of action. Plaintiff's conduct must not only 'contribute' to the injury, but must 'contribute' *as a proximate cause*. Fulton v. Chouteau County Farmers' Co., supra [98 Mont. 48, 37 Pac. (2d) 1025].

"By utilizing the words 'helping' and 'contributing' the trial court misled the jury and failed to soundly define contributory negligence. For that reason the jury might very well have based their verdict on the standard set up by the trial

court rather than upon the true standard of 'proximate cause.' Therefore the instruction as given was prejudicial to the plaintiff.''

It is true that in Mihelich v. Butte Electric Ry., 85 Mont. 604, 281 Pac. 540, 546, this court used the following language:

"Liability for injury depends upon the causal connection between the negligence or fault and the catastrophe, and attaches only when the negligence of the party charged can be said to be the sole proximate cause of the injury, as between the plaintiff and the defendant—that cause which in a natural and continuous sequence, unbroken by any new, independent cause, produces the injury and without which it would not have occurred. Kirby v. Oregon Short Line R. R., 59 Mont. 425, 197 Pac. 254; Wallace v. Chicago, etc., Ry., 48 Mont. 427, 138 Pac. 499; Fisher v. Butte Electric Ry., 72 Mont. 594, 235 Pac. 330; Id., 77 Mont. 85, 249 Pac. 1043.

"Thus negligence which cannot be traced as the proximate cause of the injury does not create liability, and, even though the defendant is shown to have been guilty of actionable negligence and it is shown that such negligence was not the *sole* proximate cause of the injury for the reason that the negligence of the plaintiff contributed as a proximate cause, no recovery may be had; but even here plaintiff's own negligence will not bar a recovery unless it existed as a concurrent, co-operating proximate cause of the injury; 45 C. J. 942, and cases cited; Daniels v. Granite Bi-Metallic Consol. Min. Co., 56 Mont. 284, 184 Pac. 826. Thus it is clear that the key to liability is: What act or acts of negligence constitute the proximate cause of the injury, without which it would not have occurred? All other acts of negligence become immaterial.

"Presupposing, then, that both plaintiff and defendant are guilty of negligence and thereafter the plaintiff remains passive and oblivious to his danger, and the defendant, after discovering the perilous situation of the plaintiff, could have avoided the accident by the exercise of reasonable care but did not

employ the means at his command to avoid it, there is a break in the sequence of events and defendant's last act of negligence becomes the sole proximate cause of the injury, while his initial negligence and the primary negligence of the plaintiff become but remote causes thereof. 45 C. J. 988, and cases cited; Neary v. Northern Pac. Ry., 41 Mont. 480, 110 Pac. 226; Nehring v. Connecticut Co., 86 Conn. 109, 84 A. 301, 524, 45 L. R. A., N. S., 896, 902.''

The court there was addressing itself to the liability of the party charged with negligence and it is certainly true that in such case the proof must show that the *sole, proximate* cause of the injury is the negligence of the party charged. However, it does not follow that in order for contributory negligence to be a defense that it, too, must be a *sole, proximate* cause, it is sufficient in my opinion if it contributes as a proximate cause of the injury. I appreciate that the instructions must be read together and that all the law applicable to a given case cannot be given in one or two instructions, but here while I concede that the court did correctly, in one of its instructions, define contributory negligence, it confused the doctrine by the instructions before referred to in that the court stated in one instance it must be the *sole, proximate* cause of the injuries to the plaintiff or it was not a defense. To my mind this places a burden upon the defendant in this action which is not warranted under the law. I believe the instructions on contributory negligence in this cause were extremely confusing and prejudicial to the defendant.

As to damages for loss of earning power, even counsel for plaintiff in his brief concedes there should have been more evidence on the matter of impairment of plaintiff's earning capacity, but insists that plaintiff was not allowed to show it by reason of objections thereto and rulings by the court. In my view, on this record, plaintiff made no such effort and the record is barren of any competent evidence of loss of earning

power, and that item should have been eliminated from the consideration of the jury by proper instruction.

I would reverse the judgment and order a new trial.

MR. JUSTICE CASTLES:

I concur in the dissenting opinion of Mr. Chief Justice Harrison.

On Motion for Rehearing

PER CURIAM.

On motion for rehearing, counsel for defendants again question the court's instructions on contributory negligence.

Instruction No. 27 was given reading:

"You are instructed that under the facts in this case contributory negligence, if any, on the part of the plaintiff, is a complete bar to any recovery by the plaintiff. You are further instructed that contributory negligence, in its legal signification, is 'such an act or omission on the part of the plaintiff, amounting to a want of ordinary care, as concurring or cooperating with the negligent acts of the defendants, is a proximate cause or occasion of the injury complained of'."

There is no doubt about the correctness of instruction No. 27. It is true that other instructions contained language that might be construed as a charge that contributory negligence was no bar unless it was the sole proximate cause of the injuries to plaintiff.

The objections to the instructions to the general effect that contributory negligence is no bar unless it was the sole proximate cause of the injury, did not specifically point out that alleged error and under the command of section 93-5101 this court may not reverse the cause on that account.

Accordingly, the petition for rehearing in this cause is denied.